UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

| | | |
|---|---|---|
| RURAL COALITION, et al., | ) | |
| | ) | Case No. 20-73220 |
| *Petitioners*, | ) | |
| | ) | EPA No. EPA-HQ-OPP-2013-0250 |
| v. | ) | |
| | ) | DECLARATION OF |
| U.S. ENVIRONMENTAL | ) | NATHAN DONLEY, PH.D. RE: |
| PROTECTION AGENCY, | ) | MOTION TO REOPEN PETITION, |
| et al., | ) | ORDER A DEADLINE TO |
| | ) | COMPLETE REMANDED |
| *Respondents*, | ) | PROCEEDINGS, AND TO |
| | ) | ENFORCE ORDER REQUIRING |
| SYNGENTA CROP | ) | STATUS REPORTS |
| PROTECTION, LLC, | ) | |
| | ) | |
| *Intervenor.* | ) | |
| _____ | ) | |

I, NATHAN DONLEY, declare that if called as a witness in this

action I would competently testify of my own personal knowledge as

follows:

1.      I have a Bachelor of Science degree in Molecular Biology from The

Evergreen State College and a Ph.D in Cell and Developmental Biology

from Oregon Health and Science University.

2.      From 2013 to 2015, I worked as a post-doctoral fellow in the

Oregon Center for Research on Occupational and Environmental

Toxicology. In that position, I studied how exogenous toxins interact

with a cell's genetics and how this can lead to chronic disease.

3.     I have worked at the Center for Biological Diversity (Center) since 2015. From 2015 to 2016, I was a scientist in the Center's Environmental Health Program. In 2016 I was promoted to Senior Scientist and in 2021 was promoted to Environmental Health Science Director.

4.     One of my ongoing responsibilities at the Center is studying the effects of pesticide use on human health and the environment. I have written over 200 technical comments to the U.S. Environmental Protection Agency (EPA) regarding new pesticide approvals, pesticide re-registrations, and ecological and human health risk assessments of pesticides subject to EPA's registration process, as well as other pesticide-related decisions and documents.

5.     I have authored 16 peer-reviewed publications, most recently a comprehensive literature review on how pesticides affect soil life[1], a

---

[1] Gunstone, T., Cornelisse, T., Klein, K., Dubey, A., & Donley, N. (2021). Pesticides and soil invertebrates: A hazard assessment. Frontiers in Environmental Science, 9. doi:10.3389/fenvs.2021.643847. Available here: https://www.frontiersin.org/articles/10.3389/fenvs.2021.643847/full.

comparison of pesticide regulatory actions between the U.S and other countries around the world[2], an analysis of how pesticides disproportionately impact people of color and low income communities in the USA[3], an analysis of the increasing fluorination of pesticides in the USA,[4] and a review of the evidence that neonicotinoid pesticides can cause developmental neurotoxicity.[5] I have also authored six technical

---

[2] Donley, N. (2019). The USA lags behind other agricultural nations in banning harmful pesticides. Environmental Health, 18(1). doi:10.1186/s12940-019-0488-0. Available here: https://ehjournal.biomedcentral.com/articles/10.1186/s12940-019-0488-0.

[3] Donley, N., Bullard, R. D., Economos, J., Figueroa, I., Lee, J., Liebman, A. K., … Shafiei, F. (2022). Pesticides and environmental injustice in the USA: Root causes, current regulatory reinforcement and a path forward. BMC Public Health, 22(1). doi:10.1186/s12889-022-13057-4. Available here: https://bmcpublichealth.biomedcentral.com/articles/10.1186/s12889-022-13057-4.

[4] Donley, N., Cox, C., Bennett, K., Temkin, A. M., Andrews, D. Q., & Naidenko, O. V. (2024). Forever pesticides: A growing source of PFAS contamination in the environment. Environmental Health Perspectives, 132(7). doi:10.1289/ehp13954. Available here: https://ehp.niehs.nih.gov/doi/10.1289/EHP13954.

[5] Sass, J. B., Donley, N., & Freese, W. (2024). Neonicotinoid pesticides: Evidence of developmental neurotoxicity from regulatory rodent studies. Frontiers in Toxicology, 6. doi:10.3389/ftox.2024.1438890. Available here:

3

reports documenting pesticide regulatory failures at the EPA.

6. Peer-reviewed scientific studies show that atrazine is extremely harmful to people. It is a known hormone-disrupting pesticide linked to birth defects,[6] multiple cancers,[7] and fertility problems like low sperm quality[8] and irregular menstrual cycles.[9]

---

https://www.frontiersin.org/journals/toxicology/articles/10.3389/ftox.2024.1438890/full.

[6] Krishnapura, S. R., McNeer, E., Dupont, W. D., & Patrick, S. W. (2024). County-level atrazine use and Gastroschisis. JAMA Network Open, 7(5), e2410056. doi:10.1001/jamanetworkopen.2024.10056. Available here: https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2818361.

[7] Remigio, R. V., Andreotti, G., Sandler, D. P., Erickson, P. A., Koutros, S., Albert, P. S., … Beane Freeman, L. E. (2024). An updated evaluation of atrazine-cancer incidence associations among pesticide applicators in the agricultural health study cohort. Environmental Health Perspectives, 132(2). doi:10.1289/ehp13684. Available here: https://pmc.ncbi.nlm.nih.gov/articles/PMC10880817/.

[8] Swan, S. H., Kruse, R. L., Liu, F., Barr, D. B., Drobnis, E. Z., & Redmon, J. B. (2003). Semen quality in relation to biomarkers of pesticide exposure. Environmental Health Perspectives, 111(12), 1478-1484. doi:10.1289/ehp.6417. Available here: https://pmc.ncbi.nlm.nih.gov/articles/PMC10880817/.

[9] Cragin, L. A., Kesner, J. S., Bachand, A. M., Barr, D. B., Meadows, J. W., Krieg, E. F., & Reif, J. S. (2011). Menstrual cycle characteristics and reproductive hormone levels in women exposed to atrazine in drinking water. Environmental Research, 111(8), 1293-1301. doi:10.1016/j.envres.2011.09.009. Available here: https://pubmed.ncbi.nlm.nih.gov/22000761/.

7.      There is also a significant number of studies just between 2016

and 2020 that show how atrazine harms wildlife. When EPA posted its

Proposed Atrazine Interim Registration Review Decision in 2020, I,

along with my colleagues at the Center, compiled 185 studies published

since 2016 that demonstrate harms to wildlife from atrazine, including

effects on growth, sexual development, metamorphosis, gene regulation,

immune function, and behavior. I submitted those studies along with

the Center's comments on the Proposed Atrazine Interim Registration

Review Decision in March 2020.[10]

8.      In December 2024, EPA posted its Updated Mitigation Proposal

for the Atrazine Interim Registration Review Decision.[11] I conducted an

analysis of this Updated Mitigation Proposal. I estimated the degree to

which EPA's new mitigation proposal, designed to reduce atrazine

---

[10] CBD Comments at 3-4, www.reglations.gov EPA Dkt. No. EPA-HQ-OPP-2013-0266-1568 (posted Mar. 26, 2020) (first document, "Comment"); "Atrazine survey post 2016" spreadsheet, EPA Dkt. No. EPA-HQ-OPP-2013-0266-1568 (posted Mar. 26, 2020) (sixth document below the main Comment document); Studies submitted at EPA Dkt. Nos. EPA-HQ-OPP-2013-0266-1568, -1569, -1570, 1580, -1581, -1582, -1582, -1583, -1584, -1585, -1586, -1587, -1589, -1590, and -1592.

[11] EPA Dkt. No. EPA-HQ-OPP-2013-0266-2135 (posted Dec. 5, 2024).

contamination in water, would reduce atrazine pollution below the level that EPA recognizes is harmful to wildlife. I found that only 1% of the 11,249 contaminated watersheds would see improvements to a level that EPA considers protective of plants and wildlife dependent on them. I am attaching a true and correct copy of the completed analysis, Center for Biological Analysis: EPA Plan Would Greenlight Atrazine Runoff Pollution at Levels Known to Cause Harm in 99% of the Nation's 11,249 Contaminated Watersheds (Jan. 30, 2025), as Exhibit A.

I declare under penalty of perjury that the foregoing is true and correct to the best of my ability.

Executed this 18th day of February 2025 in Olympia, WA,

_____
NATHAN DONLEY, PH.D

Exhibit A
To Declaration of
Nathan Donley, Ph.D.

# Center for Biological Diversity Analysis: EPA Plan Would Greenlight Atrazine Runoff Pollution at Levels Known to Cause Harm in 99% of the Nation's 11,249 Contaminated Watersheds

January 30, 2025

## Executive Summary

As part of its legally required duty to periodically reassess the safety of pesticides, the Environmental Protection Agency has released a proposal designed to reduce widespread contamination of the nation's waterways with the endocrine-disrupting herbicide atrazine.

In response to the agency's request for comments on the proposal, the Center for Biological Diversity analyzed information collected by the EPA, U.S. Department of Agriculture, and the pesticide industry to estimate the degree to which atrazine contamination of waterways would be reduced by the practices outlined in the agency's new proposal.

Our key finding: The EPA's proposal would only reduce atrazine pollution below the level EPA recognizes to harm wildlife in 1% of the nation's 11,249 contaminated watersheds, which encompass about one-eighth of the entire landmass of the continental United States.

Atrazine is the second most widely used pesticide in the United States with roughly 70 million pounds being sprayed every year, mostly in the Midwest. Atrazine is a known hormone-disrupting pesticide linked to birth defects, multiple cancers, and fertility issues, such as low sperm count and irregular menstrual cycles. Atrazine is one of the most widespread pesticide water contaminants in the country, causing devastating environmental harms, particularly to aquatic species such as frogs and fish.

Atrazine and other pesticides are regulated by the EPA. In 2020 the agency reapproved atrazine in a process called registration review, where previously approved pesticides are reassessed for safety every 15 to 20 years. One year following a legal challenge of the reapproval by the Center for Biological Diversity, Center for Food Safety and other groups, the EPA decided to reevaluate its water-quality benchmark for aquatic wildlife and update its reapproval with the findings of this reevaluation.

As part of this reevaluation process, the EPA under the Biden administration proposed to implement a water-quality threshold of 9.7 parts-per-billion (ppb) of atrazine averaged over 60 days as the level of atrazine that EPA believes is harmful to aquatic wildlife. Notably, this is nearly three times less protective than the water-quality threshold the EPA proposed just two years earlier. Even with this less-protective threshold, atrazine contamination is so widespread that dangerous levels of the pesticide are predicted in waterways in 11,249 U.S. watersheds. The contaminated areas include about 20% of all land used for U.S. agriculture – roughly 250 million acres. High levels of atrazine in watersheds overwhelmingly overlap with corn-growing areas.

In the final stage of this reevaluation, the agency has proposed a plan to reduce atrazine runoff to bring the contaminated watersheds into compliance with its proposed water quality threshold. This plan includes reducing annual atrazine application rates by 20% and establishing a "mitigation menu," which is a list of practices and exemptions that atrazine users can implement to achieve a certain number of "points." The EPA is currently proposing to require 3 points for atrazine users in watersheds with predicted atrazine levels between 9.7 ppb and 45.4 ppb and 6 points for atrazine users in watersheds with predicted atrazine levels greater than 45.4 ppb. While the acquisition of points insinuates that the atrazine user is actively doing something to reduce atrazine runoff, in practice most pesticide users qualify for exemptions built into the mitigation menu and aren't required to even slightly change atrazine use or crop production practices.

For this analysis we sought to determine how effective EPA's atrazine runoff reduction plan would be in practice. To do so we analyzed information collected by the EPA, USDA and the pesticide industry on current atrazine use and crop production practices.

We found that the EPA's proposed plan to reduce atrazine runoff will only result in waterways in an estimated 123 of the 11,249 contaminated watersheds (1%) to drop below the level EPA recognizes to harm wildlife. This means that 99% of the nation's lakes, rivers and streams predicted to have dangerous levels of atrazine would remain harmful to aquatic wildlife following EPA's proposed runoff reduction plan.

Waterways in each atrazine-impaired watershed would only see atrazine concentrations reduced between 2% and 6% after the EPA's proposal is implemented — not nearly enough of a reduction to meaningfully impact atrazine levels in contaminated waterways. Following implementation of the EPA's proposal, 70% of atrazine-impaired waterways would still have predicted concentrations twice as high as the level EPA recognizes to significantly harm aquatic wildlife; 30% would have predicted atrazine concentrations five times higher than that threshold.

Our analysis concludes that the EPA's proposed plan to reduce atrazine runoff will be completely ineffective at protecting wildlife and will do very little to lower the levels of atrazine pollution in waterways across the country.

Current atrazine use practices are unsustainable and result in enormous societal costs, such as loss of natural resources, water contamination, and healthcare costs. The best path forward is for EPA to ban its use, as has been done in 60 countries throughout the world. Absent this, we call on the agency to overhaul its proposal and introduce new research-based measures capable of effectively achieving meaningful reductions in the harm being caused by this pesticide.

**Table of Contents**

1) **Introduction** ................................................................................................ 4

2) **How EPA's Maximum Annual Application Rate Reductions Are Likely to Impact Atrazine Use in Watersheds That Exceed the CE-LOC** ........................ 6

    a. Determining the Primary Contributor to Atrazine Concentrations in Each HUC12 Watershed ................................................................................................ 6

    b. Corn and Sorghum ........................................................................................ 7

    c. Sugarcane ...................................................................................................... 9

3) **How EPA's Requirements for Bin 1 Mitigations (3 points) are Likely to Impact Current Growing Practices and Atrazine Use in Watersheds with Predicted 60-day Average Atrazine Concentrations Between 9.7-45.4 ppb** ................ 10

    a. Corn and Sorghum ...................................................................................... 10

        i. *Mitigation Relief Points* ...................................................................... 11

        ii. *Points for Irrigation Practices* ............................................................ 12

        iii. *Points for Tillage Practices* ................................................................ 13

        iv. *Points for Application Rate Reduction* ................................................ 13

        v. *Percent of Corn and Sorghum Acres that Can Achieve 3 Mitigation Points Based on Current Practices* ................................................................ 15

    b. Sugarcane .................................................................................................... 19

        i. *Mitigation Relief Points* ...................................................................... 20

        ii. *Points for Irrigation Practices* ............................................................ 21

        iii. *Points for Tillage Practices* ................................................................ 22

        iv. *Points for Application Rate Reduction* ................................................ 22

        v. *Percent of Sugarcane Acres that Can Achieve 3 Mitigation Points Based on Current Practices* ........................................................................................ 24

4) **How EPA's Requirements for Bin 2 Mitigations (6 points) are Likely to Impact Current Growing Practices and Atrazine Use in Watersheds with Predicted 60-day Average Atrazine Concentrations > 45.4 ppb** ...................... 26

    a. Corn and Sorghum ...................................................................................... 26

    b. Sugarcane .................................................................................................... 30

5) **How the combination of EPA's proposed runoff mitigations is likely to impact atrazine levels in watersheds containing ≥ 9.7 ppb** ................................ 35

6) **Limitations, Assumptions and Uncertainties in This Analysis** ................ 36

    a. Watershed Impacts by Use .......................................................................... 36

b.   Corn, Sorghum and Sugarcane Growers Vs. Atrazine Users ............................................. 37

c.   Uncertainties in Mitigation Relief Options for Corn ....................................................... 38

d.   Impacts of Regional Differences in Irrigation ................................................................. 38

e.   Impacts of Regional Differences in Tilling...................................................................... 39

f.   Impacts of Regional Differences in Application Rate ..................................................... 40

g.   Impacts of Potential Combinational Bias in Mitigation Adoption Estimation ................ 40

**7)   Supplemental Files**.............................................................................................................. 42

### 1)   Introduction

In EPA's Updated Mitigation Proposal for the Atrazine Interim Registration Review Decision,[1] EPA has proposed to implement four separate mitigations the agency believes will reduce atrazine runoff:[2]

1) Restrict maximum annual application rates for:
   - sorghum, field corn, and sweet corn to 2.0 lbs ai/A/year or less for applications
   - sugarcane to 8.0 lbs a.i./acre in Florida and 4.0 lbs a.i./acre in Louisiana and Texas
2) Prohibit application during rain.
3) Prohibit when soils are saturated or above field capacity.
4) Users must visit a website to determine if their field falls within a Bin that requires runoff mitigation:
   - If in Bin 1, applicators must have achieved 3 points prior to making an application.
   - If in Bin 2, applicators must have achieved 6 points prior to making an application.

For our analysis, we sought to understand how efficacious this runoff mitigation plan would be if implemented in watersheds that have predicted atrazine concentrations above the Concentration Equivalent Level of Concern (CE-LOC) of 9.7 ppb averaged over 60 days.

We have focused our analysis on mitigations #1 and #4 above. EPA has found that prohibiting applications to saturated soils or during rain align with best management practices and are already implemented by atrazine users.[3] EPA concluded that both label requirements are likely already being implemented by growers and would not impact current growing practices significantly. Therefore, we have omitted these label requirements from our analysis and concur with EPA that they will largely maintain the status quo.

Thus, our analysis focuses on runoff mitigations #1 and #4 because these are the mitigations that have the potential to reduce atrazine runoff concentrations from their current levels under already

---

[1] EPA. Updated Mitigation Proposal for the Atrazine Interim Registration Review Decision, Case Number 0062. 11/20/2024. Found here: https://www.regulations.gov/document/EPA-HQ-OPP-2013-0266-2135. Hereafter "Updated Mitigation Proposal"

[2] Updated Mitigation Proposal at 12-13.

[3] Updated Mitigation Proposal at 13-14.

implemented practices. This is important because monitoring and modelling data have found or predicted atrazine at concentrations significantly above aquatic life thresholds,[4] and more than 1/8th of the watersheds in the contiguous U.S. currently exceed the CE-LOC.[5] We note that even with the current growing practices of most corn, sorghum and sugarcane not being irrigated or irrigated using subsurface techniques, the majority of corn, sorghum and sugarcane acres implementing no tillage/reduced tillage practices, reduced atrazine application rates, and other management practices that have been put in place over the years, atrazine surface water concentrations still remain incredibly high and concerning to the EPA and the broader public. Therefore, a successful runoff mitigation plan requires significant changes in atrazine use and crop production practices because the practices currently in place are highly inadequate by themselves.

Our analysis is divided into five parts.

1) How EPA's maximum annual application rate reductions are likely to impact atrazine use in watersheds that exceed the CE-LOC

2) How EPA's requirements for Bin 1 mitigations (3 points) are likely to impact current growing practices and atrazine use in watersheds with predicted 60-day average atrazine concentrations between 9.7-45.4 ppb.

3) How EPA's requirements for Bin 2 mitigations (6 points) are likely to impact current growing practices and atrazine use in watersheds with predicted 60-day average atrazine concentrations > 45.4 ppb.

4) How the combination of EPA's proposed runoff mitigations is likely to impact atrazine levels in watersheds containing ≥ 9.7 ppb.

5) Limitations, Assumptions and Uncertainties in this analysis

For our analysis, we utilized data provided to us by EPA on predicted watershed atrazine levels in the U.S.[6] Specifically, we requested and received the predicted 60-day average atrazine concentrations for each of the 82,921 HUC12 watersheds analyzed by EPA, the crosswalk of what state(s) each HUC12 watershed is present in, and the crosswalk of the counties each HUC12 watershed is present in for Louisiana, Florida and Texas (Supplemental File A, Sheets 1-3). From these data, we identified the 11,249 HUC12 watersheds that contained 60-day average atrazine concentrations between 9.7-45.4 ppb (7,152) and above 45.4 ppb (4,097) (Supplemental File A, Sheet 4). We added state-level data to this spreadsheet to determine the relevant state(s) each HUC12 watershed is present in (Supplemental File A, Sheet 7).

---

[4] Updated Mitigation Proposal at 7.

[5] 11,249 HUC12 watersheds above the CE-LOC divided by total HUC12 watersheds of 82,921 equals 14% total HUC12 watersheds impaired (between 1/8th and 1/7th of all HUC12's in contiguous U.S.)

[6] Email communication between Center for Biological Diversity scientist Nathan Donley and EPA Chemical Review Manager Alexander Hazlehurst on 12/11/2024 and 12/16/2024.

2) **How EPA's Maximum Annual Application Rate Reductions Are Likely to Impact Atrazine Use in Watersheds That Exceed the CE-LOC**

    a. <u>Determining the Primary Contributor to Atrazine Concentrations in Each HUC12 Watershed</u>

Due to lack of available data, we have analyzed two different atrazine uses with regards to runoff contribution: 1) corn and sorghum, and 2) sugarcane. Atrazine has a few other minor agricultural and non-agricultural uses besides these that we were unable to account for in our analysis and we did not have enough information to parse out data on sweet corn, field corn and sorghum use (so we combined these into one use layer). Corn, sorghum and sugarcane account for most atrazine use in the U.S. and are widely considered to be the greatest contributors to atrazine concentration in waterways throughout the U.S. Corn and sorghum are highly similar crops with very similar atrazine uses, field requirements and production practices, such as irrigation and tillage. And sweet corn comprises only 1% of corn grown in the U.S. Therefore, our focus on only three crops (corn, sorghum and sugarcane) will account for nearly all atrazine use in the country and our decision to combine field corn, sweet corn and sorghum into one use layer should not significantly impact our results.

To ease our analysis, we categorized each of the HUC12 watersheds that have predicted 60-day average atrazine concentrations $\geq 9.7$ ppb into one of two bins: 1) primarily impacted by atrazine use on sugarcane and 2) primarily impacted by atrazine use on corn/sorghum.

To identify the HUC12 watersheds that are primarily impacted by atrazine use on sugarcane, we utilized USDA data on where sugarcane is grown in the contiguous U.S. USDA notes that most sugarcane production in the U.S. occurs in Florida, the Delta region of Louisiana, and the lower Rio Grande Valley in the southern tip of Texas.[7] Available data from USDA indicate that little to no corn is grown in Florida, but some corn is grown in Texas and Louisiana – primarily in the northern parts of the states.[8] Little to no sorghum is grown in Florida and Louisiana, however some sorghum is grown in southern Texas.[9] County maps of sugarcane production indicate that the crop is primarily grown in central Florida, the southern half of Louisiana and the southern tip of Texas.[10]

Therefore, we assumed that all of the HUC12 watersheds in Florida were primarily impacted by atrazine use on sugarcane. For Louisiana, we assumed that any HUC12 watershed in a county south of Vernon, Rapides, and Avoyelles counties was primarily impacted by atrazine use in sugarcane. The remaining Louisiana counties were assumed to be primarily impacted by atrazine use in corn/sorghum. For Texas, we assumed that all HUC12 watersheds in the counties of Hidalgo, Willacy and Cameron were primarily impacted by atrazine use in sugarcane. The

---

[7] USDA ERS. Sugar & Sweeteners: U.S. Sugar Production. Available here: https://www.ers.usda.gov/topics/crops/sugar-and-sweeteners/background/
[8] USDA. Corn grown for grain 2023. Harvested acres by county for selected states. Available here: https://www.nass.usda.gov/Charts_and_Maps/graphics/CR-HA-RGBChor.pdf
[9] USDA. Sorghum 2023. Planted acres by county for selected states. Available here: https://www.nass.usda.gov/Charts_and_Maps/Crops_County/as-pl.php
[10] USDA. United States Sugarcane production 2014-2018. Available here: https://ipad.fas.usda.gov/rssiws/al/crop_production_maps/US/USA_Sugarcane.png

remaining Texas counties were assumed to be primarily impacted by atrazine use in corn/sorghum.

We acknowledge that some watersheds may be impacted by atrazine use on both crops – for instance, the southern tip counties of Texas grow both sugarcane and sorghum – and we discuss this uncertainty in Section 6 below.

From this information we generated spreadsheets for HUC12 watersheds in corn/sorghum and sugarcane growing regions. In Supplemental File A, Sheet 8, we identified the HUC12 watersheds that contain ≥ 9.7 ppb 60-day average atrazine concentrations and exist in TX, LA, or FL. There were 1,403 HUC12 watersheds that met those parameters. The relevant county information was also included in this spreadsheet. From this spreadsheet we separated the TX, LA, and FL HUC12 watersheds that met the sugarcane or corn/sorghum use data layer parameters outlined above (Supplemental File A, Sheet 9 contains the TX, LA and FL HUC12 watersheds in the sugarcane use data layer and Supplemental File A, Sheet 10 contains the TX, LA and FL HUC12 watersheds in the corn/sorghum use data layer).

Supplemental File A, Sheet 9 contains the 134 HUC12 watersheds that are likely to be most greatly impacted by atrazine use in sugarcane. To attain the HUC12 watersheds most greatly impacted by atrazine use in corn/sorghum, we deleted the 134 HUC12 watersheds in Supplemental File A, Sheet 9 from Supplemental File A, Sheet 7. The resulting spreadsheet contains the 11,115 HUC12 watersheds in the corn-sorghum use data layer (Supplemental File A, Sheet 11).

Therefore, of the 11,249 HUC12 watersheds impacted by atrazine above the CE-LOC, 134 will be analyzed relevant to the proposed runoff mitigations put in place for sugarcane and 11,115 will be analyzed relevant to the proposed runoff mitigations put in place for corn and sorghum.

      b. <u>Corn and Sorghum</u>

Supplemental File A, Sheet 11 identifies the 11,115 HUC12 watersheds that have 60-day average atrazine concentrations above the CE-LOC and are primarily impacted by atrazine use in corn and sorghum.

The following is the proposed reduction in maximum annual application rates in corn and sorghum that the agency is proposing:

- Reduction of corn and sorghum maximum annual application rates from 2.5 lbs a.i./A/year to 2 lbs a.i./A/year

To determine how EPA's proposed maximum annual rate reductions for atrazine will impact these watersheds, we gathered data on the extent and likelihood of rate reductions in the relevant watersheds. EPA has identified the percentage of field corn users who report using annual application rates higher than the proposed maximum of 2 lbs a.i./A/year.[11] EPA has estimated

---

[11] EPA. Assessment of the Benefits of Atrazine and the Impacts of Potential Mitigation for Field Corn, Sweet Corn, Sorghum, and Sugarcane; PC Code (080803). June 23, 2022. Page 24; Table 6. Found here: https://www.regulations.gov/document/EPA-HQ-OPP-2013-0266-1624 (Hereafter "Benefits Assessment")

that 11% of atrazine users in the corn belt,[12] 9% of atrazine users in the plains states,[13] and 20% of atrazine users in the southern seaboard[14] currently apply atrazine above the proposed maximum annual application rate.[15]

We categorized each watershed in corn and sorghum-growing regions into the 1) Corn Belt, 2) Plains States and 3) Southern Seaboard (Supplemental File B, Sheets 12-14). Around 87% of HUC12 watersheds that had CE-LOC exceedances were in these three regions. For states that did not fall into either of these three EPA-defined[16] categories, we used the national average of 10% of users applying atrazine above the proposed maximum rate of 2 lbs a.i./A/year[17] (referred to as "undefined" states, Supplemental File B, Sheet 15). For HUC12 watersheds that span multiple states, we conservatively applied the highest relevant percentage applicable to that watershed.

Since EPA has proposed a maximum annual rate reduction of 2.5 lbs a.i./A/year to 2 lbs a.i./A/year, the amount of rate reduction these growers would be required to adopt is assumed to be a 20% decrease.

In this analysis we assume that the proportion of applicators using atrazine above the proposed annual maximum application rate in a certain region remains constant in each watershed in that region. For instance, since an estimated 11% of atrazine users in the Corn Belt apply atrazine above 2 lbs a.i./A/year, we assume that 11% of atrazine users in each watershed in the corn belt states apply at that rate. In reality, this will overestimate the impact of rate reductions in some regions and underestimate it in others, as there will inevitably be some variability at the individual watershed level that is not evident in regional averages. However, without more precise pesticide use data, this approach remains the most accurate approach to estimate the impact of rate reductions on atrazine levels in relevant watersheds.

Therefore, in each HUC12 watershed in each of the four regions: 1) Plains States, 2) Corn Belt, 3) Southern Seaboard and 4) Undefined, we estimate that 9%, 11%, 20% and 10% of growers, respectively, will reduce their application rates by 20% in the relevant watersheds. This amounts to a total of 1.8%, 2.2%, 4%, and 2% reduction in atrazine runoff in each Plains States, Corn Belt, Southern Seaboard and Undefined watershed, respectively.[18]

This analysis is presented in Supplemental File B, Sheets 12-15. Supplemental File B, Sheet 16 combines all of the 11,115 HUC12 watersheds in the four regions and sorts by the newly predicted 60-day atrazine concentration based on EPA's proposed maximum annual application rate reduction. Based on these data, 119 out of 11,115 watersheds (about 1%) are estimated to no longer exceed the CE-LOC due to the proposed maximum annual application rate reduction

---

[12] Illinois, Indiana, Iowa, Missouri, and Ohio.

[13] Colorado, Kansas, Nebraska, North Dakota, Oklahoma, South Dakota, and Texas.

[14] Alabama, Delaware, Georgia, Maryland, North Carolina, South Carolina, and Virginia.

[15] Benefits Assessment Page 24; Table 6.

[16] Benefits Assessment Pages 6-7.

[17] Benefits Assessment Page 24; Table 6.

[18] Assuming 9%, 11%, 20% and 10% of corn/sorghum acres in each watershed achieve a 20% reduction in atrazine runoff = 0.09 * 0.2 = 0.018 (total 1.8% reduction atrazine runoff in each HUC12 watershed), = 0.11 * 0.2 = 0.022 (total 2.2% reduction atrazine runoff in each HUC12 watershed), = 0.2 * 0.2 = 0.04 (total 4% reduction atrazine runoff in each HUC12 watershed), = 0.1 * 0.2 = 0.02 (total 2% reduction atrazine runoff in each HUC12 watershed).

mitigation. The waterbodies in 10,996 watersheds (about 99%) are predicted to remain harmful to aquatic plant communities and the wildlife that depend on them.

        c.   Sugarcane

Supplemental File A, Sheet 9 identifies the 134 HUC12 watersheds that have 60-day average atrazine concentrations above the CE-LOC and are primarily impacted by atrazine use in sugarcane.

The following is the proposed reduction in maximum annual application rate in sugarcane that the agency is proposing:

-   Reduction of sugarcane maximum annual application rates from 10 lbs a.i./A/year to 8 lbs a.i./A/year in Florida and to 4 lbs a.i./A/year in Louisiana and Texas

To determine how EPA's proposed maximum annual rate reductions for atrazine will impact these watersheds, we gathered data on the extent and likelihood of rate reductions in the relevant counties. Since data on annual application rates are not available for sugarcane,[19] we had to make some assumptions. EPA has stated that it does not anticipate that sugarcane growers will be impacted by its proposed rate reductions because it has accounted for regional differences in use, via a higher maximum annual application rate in Florida compared to Texas and Louisiana.[20] Therefore, we assume in this analysis that few growers will be impacted by EPA's proposal to reduce the annual application rate. However, it is possible that a minority of growers who currently use the maximum application rate will be impacted. We have identified what we believe to be a conservative estimate that 10% of sugarcane growers will be required to reduce their annual application rate to the new proposed maximum. This value aligns with the number of corn growers the agency believes will be impacted nationally by the proposed rate reduction in corn[21] and is consistent with EPA statements that rate reduction impacts would be low.

The amount of rate reduction this 10% of growers would be required to adopt is assumed to be a 20% decrease from 10 lbs a.i./A/year to 8 lbs a.i./A/year for Florida growers. For Louisiana and Texas, given that the typical annual application rate range is estimated to be 2-3 lbs a.i./A/year[22], we believe that very few, if any, growers in these states are applying atrazine at annual rates higher than 5 lbs a.i./A/year. EPA's position that sugarcane growers will not be impacted by its annual rate reductions[23] provides further support for this assumption. Therefore, the amount of rate reduction that 10% of TX and LA sugarcane growers would be required to adopt is assumed to be a 20% decrease from 5 lbs a.i./A/year to 4 lbs a.i./A/year.

---

[19] Updated Mitigation Proposal at 13.

[20] Updated Mitigation Proposal at 13. "Based on available data, EPA does not anticipate that sugarcane growers will be impacted by the proposed rate reductions given the proposed reductions account for rates based on soil type. Sugarcane growers in Florida have organic soils that tightly absorbs atrazine and, therefore, requires higher rates for effective weed control compared to growers in Louisiana.

[21] Updated Mitigation Proposal at 13.

[22] EPA. EPA/OPP/BEAD Information & Data Inquiry on Proposed Atrazine Runoff Mitigations for Field Corn, Sorghum, Sugarcane and Sweet Corn. April 4, 2022. Page 9. Found here: https://www.regulations.gov/document/EPA-HQ-OPP-2013-0266-1614. (Hereafter "Data Inquiry")

[23] Updated Mitigation Proposal at 13.

In this analysis we assume that the proportion of applicators using atrazine above the proposed annual maximum application rate in a certain region remains constant in each watershed in that region. For instance, since an estimated 10% of atrazine users in Florida are estimated to apply atrazine above 8 lbs a.i./A/year, we assume that 10% of atrazine users in each watershed in Florida apply at that rate. In reality, this will overestimate the impact of rate reductions in some regions and underestimate it in others, as there will inevitably be some variability at the individual watershed level that is not evident in state estimates. However, without more precise pesticide use data, this approach remains the best scientific data available to estimate the impact of rate reductions on atrazine levels in relevant watersheds.

Therefore, our analysis assumes that 10% of sugarcane growers in each relevant watershed will be required to reduce their application rates by 20% to come into compliance with EPA's proposed maximum annual rate reductions for sugarcane in FL, TX and LA. This amounts to a total of 2% reduction in atrazine runoff in each watershed.[24]

This analysis is presented in Supplemental File B, Sheet 17. This spreadsheet presents data on all of the 134 HUC12 watersheds in sugarcane growing counties and sorts by the newly predicted 60-day atrazine concentration based on EPA's proposed maximum annual application rate reduction. Based on these data, 1 out of 134 watersheds (about 1%) are estimated to no longer exceed the CE-LOC due to this specific runoff mitigation. The waterbodies in 133 watersheds are predicted to remain harmful to aquatic plant communities and the wildlife that depend on them.

### 3) How EPA's Requirements for Bin 1 Mitigations (3 points) are Likely to Impact Current Growing Practices and Atrazine Use in Watersheds with Predicted 60-day Average Atrazine Concentrations Between 9.7-45.4 ppb

#### a. Corn and Sorghum

EPA is proposing to require 3 points of runoff mitigation for users who want to use atrazine in HUC12 watersheds with predicted 60-day average atrazine concentrations between 9.7-45.4 ppb (Hereafter referred to as "Bin 1 watersheds"). 7,070 of the 11,115 HUC12 watersheds primarily impacted by atrazine use in corn/sorghum are Bin 1 watersheds (Supplemental File B, Sheet 18).

Runoff mitigation points are calculated from EPA's recently updated Runoff Mitigation Menu.[25] This menu contains a mix of mitigation "relief points" – which are points given to users who do not implement any mitigation, but apply pesticides in areas or in a manner where EPA believes runoff will be reduced – and mitigation points. Importantly, for this analysis, we are not interested in how many atrazine users implement "mitigations," but how many users will be required to implement further mitigations above and beyond their current growing practices. Since EPA has predicted concerning atrazine levels in water throughout the country at present

---

[24] Assuming 10% of corn/sorghum acres in each watershed achieve a 20% reduction in atrazine runoff = 0.1 * 0.2 = 0.02 (total 2% reduction atrazine runoff in each HUC12 watershed)
[25] https://www.epa.gov/pesticides/mitigation-menu

day, any mitigation in atrazine harm will necessarily need to come from measures taken above and beyond what is currently implemented.

### i. Mitigation Relief Points

To calculate how many atrazine users will qualify for mitigation "relief points," we utilized an analysis conducted by BASF and Compliance Services International.[26]

This 2024 analysis calculated the number of acres for six crop groups (including corn) that would be "exempt" from having to implement mitigations under the current "herbicide strategy" that is being implemented under the Endangered Species Act ("ESA"), as well as for EPA's atrazine proposal. For the "non-exempt" acres of corn, this analysis calculated the mitigation relief points (which the researchers refer to as "field characteristic exemptions") that corn growers would achieve using the relief measures of "reduced runoff potential," "low slope," and "sandy soils," which correspond to the first three mitigation relief options in EPA's mitigation menu.[27] The researchers found that 90% of "non-exempt" corn acres grown in the U.S. would achieve ≥2 runoff mitigation points with these three relief options.[28]

The researchers found that 30% of corn acreage would be "exempt" from having to implement any further mitigation due to being >1,000 ft from aquatic and terrestrial wildlife habitat.[29] This exemption also exists in EPA's current atrazine proposal.[30] Therefore, for 30% of corn acres, 100% would be exempt from having to acquire mitigation points due to being <1,000 ft from aquatic or terrestrial habitat. For the remaining 70% of corn acreage that was "non-exempt," the researchers found that 10% (7% total) would attain 1 point, 39% (27.3% total) would attain 2 points, 2% (1.4% total) would attain 4 points, 36% (25.2% total) would attain 5 points, and 13% (9.1% total) would attain ≥6 points (total of 90% of the 70% of "non-exempt" corn acres receiving ≥2 points).[31]

Based on this analysis, we assumed that 30% of corn acres would be exempt from having to put in place mitigations. The remaining 70% would not be exempt from having to attain points and would immediately be eligible for the following point totals based on relief points: 7% total would attain 1 point, 27.3% would attain 2 points, 1.4% would attain 4 points, 25.2% would attain 5 points, and 9.1% would attain ≥6 points.

In addition to the three mitigation-relief options the researchers analyzed, EPA also has an additional mitigation relief option worth 1 point, which is the Mitigation Tracking option.[32] This gives the user 1 point for documenting their mitigations in paper or electronic format. Due to the

---

[26] Campana, D and Hassinger, C. Quantifying field characteristic exemptions and runoff mitigation points from EPA's ESA Strategy Documents. Presentation at the American Chemical Society 2024 Fall Meeting. August 18, 2024. Available here: https://complianceservices.com/wp-content/uploads/Quantifying-the-Potential-Agricultural-Area-Affected-by-EPAs-Draft-Herbicide-Strategy_18Aug24.pdf. Document also submitted to the docket. (Hereafter "BASF ACS presentation").

[27] https://www.epa.gov/pesticides/mitigation-menu

[28] BASF ACS presentation. Page 21. Red bar in graph corresponding to "corn" on the x axis.

[29] BASF ACS presentation. Page 19.

[30] Updated Mitigation Proposal at 15.

[31] BASF ACS presentation. Page 21.

[32] https://www.epa.gov/pesticides/mitigation-menu The 4th option down in Table 1.

relative ease of this mitigation relief option, our analysis assumes that 100% of atrazine users will choose to implement this option and receive 1 point.

Therefore, the 90% of "non-exempt" corn acreage that the researchers predict will qualify for ≥2 mitigation relief points based on field characteristics alone will also qualify for 1 additional relief point for mitigation tracking. This means that 93% of corn acreage (and potential atrazine use sites) will achieve ≥3 runoff mitigation relief points without having to implement any further mitigation or will be totally exempt from further mitigation (Table 1).

**Table 1: Mitigation Relief Points that Will Be Achieved by Proportion of U.S. Corn/Sorghum Acres**

| % of U.S. Corn/Sorghum Acres | Mitigation "Relief" Points Achieved |
|---|---|
| 7 | 1 |
| 27.3 | 3 |
| 1.4 | 4 |
| 25.2 | 5 |
| 9.1 | ≥6 |
| 30 | exempt |

*data obtained from Campana, D and Hassinger, C., 2024 and adapted to add 1 extra point for all corn acres using the mitigation tracking option

### ii. Points for Irrigation Practices

The 2017 USDA Census of Agriculture indicates that 13,929,183 acres of grain and silage corn are irrigated out of a total U.S. corn acreage of 90,847,976 acres.[33] This means that 15% of corn acres grown in the U.S. are currently irrigated and 85% are not irrigated, or "rainfed." Furthermore, EPA has found that sorghum is also rarely irrigated, with ≤10% of sorghum acres in the largest sorghum producing states practicing irrigation.[34]

EPA's mitigation menu contains an in-field mitigation option of "irrigation management." Under this option, atrazine users will achieve 3 points for not irrigating their crop. Therefore, for our analysis we assumed that 85% of corn/sorghum atrazine users will receive 3 points for not irrigating their crop. This assumption does not account for regional differences in irrigation, which are known to occur.[35] This is limitation is discussed in Section 6 and we have concluded that not accounting for regional differences in irrigation will not significantly affect our findings.

---

[33] USDA. 2017 Census of Agriculture. Table 35. Specified Crops by Acres Harvested: 2017 and 2012. Available here: https://www.nass.usda.gov/Publications/AgCensus/2017/Full_Report/Volume_1,_Chapter_1_US/st99_1_0035_0035.pdf

[34] Benefits Assessment Page 30.

[35] Benefits Assessment Page 30.

**Table 2: Points Achieved for Irrigation Practices by Proportion of U.S. Corn/Sorghum Acres**

| % of U.S. Corn/sorghum Acres | Mitigation Points Achieved |
|---|---|
| 85 | 3 |

### iii. Points for Tillage Practices

USDA has found that in 2021, 36% of corn acres in the U.S. practiced no-till and 40% practiced mulch-till, both of which are considered conservation tillage techniques.[36] USDA has also communicated to EPA that 75% of sorghum acres utilize conservation tillage, almost identical to that of corn.[37]

EPA's mitigation menu contains an in-field mitigation option of "conservation tillage." Under this option, atrazine users will achieve 3 points for using the no-till practice and 2 points for using the mulch-till practice. Therefore, our analysis assumes that 36% of corn/sorghum acres would achieve 3 points for no-till and 40% would achieve 2 points for mulch-till (76% total acres would receive 2-3 points). This assumption does not account for regional differences in adoption of conservation tillage, which can occur to some extent.[38] This limitation is discussed in Section 6 and we have concluded that not accounting for regional differences in conservation tillage will not significantly affect our findings.

**Table 3: Points Achieved for Tillage Practices by Proportion of U.S. Corn/Sorghum Acres**

| % of U.S. Corn/Sorghum Acres | Mitigation Points Achieved |
|---|---|
| 36 | 3 |
| 40 | 2 |

### iv. Points for Application Rate Reduction

EPA has found that a sizeable portion of atrazine users currently apply less than maximum rates of atrazine on corn fields. Below are the annual atrazine rates used by proportion of atrazine-treated corn acreage nationally.[39]

---

[36] USDA. Economic Research Service. Adoption of conservation tillage has increased over the past two decades on acreage planted to major U.S. cash crops. October 25, 2022. Available here: https://www.ers.usda.gov/data-products/chart-gallery/gallery/chart-detail/?chartId=105042.

[37] Data Inquiry at Page 5.

[38] USDA. Economic Research Service. Tillage Intensity and Conservation Cropping in the United States. September 2018. Page 13. Available here: https://ers.usda.gov/sites/default/files/_laserfiche/publications/90201/EIB-197.pdf?v=77252.

[39] Benefits Assessment Page 24; Table 6.

10% of corn acreage treated with >2.0 lbs a.i./acre

18% of corn acreage treated with between 2.0 - 1.5 lbs a.i./acre

21% of corn acreage treated with between 1.5 - 1.0 lbs a.i./acre

30% of corn acreage treated with between 1.0 - 0.625 lbs a.i./acre

21% of corn acreage treated with between 0.625 - 0 lbs a.i./acre

EPA's mitigation menu contains an application parameter mitigation option of an "annual application rate reduction." Under this option, atrazine users will achieve 1 point for applying 10% to <30% less than the maximum labeled annual application rate; 2 points for applying 30% to <60% less than the maximum labeled annual application rate, and; 3 points for applying ≥60% less than the maximum labeled annual application rate.[40]

To assign a point value to the corn acreage that currently applies less than maximal annual rates of atrazine, we estimated the proportion of corn acreage that would qualify for 1, 2, or 3 points based on current atrazine application practices identified by EPA. Since EPA has proposed to reduce the maximum annual application rate for sorghum and corn to 2.0 lbs ai/A/year, that is the ceiling we have used to determine percent reduction. We have calculated the percent reduction in application rate by proportion of corn acreage identified by EPA from the values identified above.

10% of corn acreage treated with >2.0 lbs a.i./acre   >>>   no reduction

18% of corn acreage treated with between 2.0 - 1.5 lbs a.i./acre   >>>   0%-25% reduction

21% of corn acreage treated with between 1.5 - 1.0 lbs a.i./acre   >>>   25%-50% reduction

30% of corn acreage treated with between 1.0 - 0.625 lbs a.i./acre   >>>   50%-68% reduction

21% of corn acreage treated with between 0.625 - 0 lbs a.i./acre   >>>   68%-99% reduction

Since the percent reduction values above do not line up with the percent reduction values that determine number of points achieved (10% to <30% reduction = 1 point, 30% to <60% reduction = 2 points, ≥60% reduction = 3 points), we divided up each group based on the anticipated proportion that would fall into each of the mitigation menu's three point-bins.

For the 10% of corn acres that are sprayed with >2.0 lbs a.i./acre, we concluded that no rate reduction was taking place (0 points). For the 18% of corn acres that have a 0-25% reduction in atrazine rates, we assumed that half would achieve between 10-25% reduction (1 point) and the other half would achieve <10% reduction (0 points). For the 21% of corn acres that have a 25-

---

[40] https://www.epa.gov/pesticides/mitigation-menu

50% reduction in atrazine rates, we assumed that 90% would achieve between 30-50% reduction (2 points) and 10% would achieve between 25-30% reduction (1 point). For the 30% of corn acres that have a 50-68% reduction in atrazine rates, we assumed that half would achieve between 50-60% reduction (2 points) and the other half would achieve between 60-68% reduction (3 point). The remaining 21% of corn acres that have a 68%-99% reduction in atrazine rates were all assigned 3 points. These assumptions are outlined below:

10% of corn acreage treated with >2.0 lbs a.i./acre     >>>    10% = 0 pt

18% of corn acreage treated with between 2.0 - 1.5 lbs a.i./acre     >>>    9% = 1 pt, 9% = 0 pt

21% of corn acreage treated with between 1.5 - 1.0 lbs a.i./acre     >>>    19% = 2 pt, 2% = 1 pt

30% of corn acreage treated with between 1.0 - 0.625 lbs a.i./acre     >>>    15% = 3 pt, 15% = 3 pt

21% of corn acreage treated with between 0.625 - 0 lbs a.i./acre     >>>    21% = 3 pt

Using the above assumptions that allowed us to convert known atrazine usage patterns to mitigation points, Table 4 identifies the point values we use in our analysis to account for points achieved through application rate reductions. Since these point values are based on national averages, it does not account for regional differences in atrazine application rates, which are known to occur.[41] This limitation is discussed in Section 6 and we have concluded that not accounting for regional differences in application rate reduction will not significantly affect our findings.

**Table 4: Points Achieved Through Application Rate Reduction by Proportion of U.S. Corn/Sorghum Acres**

| % of U.S. Corn/Sorghum Acres | Mitigation Points Achieved |
|---|---|
| 19 | 0 |
| 11 | 1 |
| 34 | 2 |
| 36 | 3 |

>     *v. Percent of Corn and Sorghum Acres that Can Achieve 3 Mitigation Points Based on Current Practices*

To determine how many corn and sorghum acres in the U.S. would be eligible for 3 atrazine runoff mitigation points based on current practices and field characteristics, we took a proportionality approach. For example, if Mitigation A achieves 3 points and is practiced on 60%

---

[41] Benefits Assessment Page 24; Table 6.

of acres and Mitigation B achieves 3 points and is practiced on 40% of acres, our analysis would assume the following: Mitigation A would result in 60% of acres receiving 3 points and 40% of acres would receive 0 points. With the introduction of Mitigation B, we would assume that 40% of acres would achieve 3 points and 60% of acres would achieve 0 points. To combine the two, we would assume that 40% of the 60% of acres implementing Mitigation A would also implement Mitigation B (and get an additional 3 points = 6 points total) and the remaining 60% of the 60% of acres implementing Mitigation A would not implement Mitigation B (and get an additional 0 points = 3 points total). This can be visualized in Figure 1.

**Figure 1:**



Point totals by proportion of acres for implementing Mitigations A+ B:
24% of acres achieve 6 pts
52% of acres achieve 3 pts
24% of acres achieve 0 points

This analysis assumes that the proportionality of mitigation adoption observed in the U.S. at large is maintained across adopters of other mitigations, which may or may not be the case. For instance, just because 40% of U.S. acres implement Mitigation B does not necessarily mean that 40% of acres that implement Mitigation A will also implement Mitigation B. We conclude that without available data on the proportion of acres that implement multiple practices from the mitigation menu, this is currently the most accurate way of determining the proportion of acres that will receive points under EPA's mitigation menu.

To determine the percent of corn and sorghum acres that can achieve 3 mitigation points based on current practices, we used the information on mitigation adoption outlined in Tables 1-4. This accounts for corn and sorghum acres that can achieve points for: mitigation relief, irrigation practices, tillage, application rate reduction or are exempt from runoff mitigation. Table 5 below combines the point totals from Tables 1-4.

**Table 5: Points Achieved Through Mitigation Menu Practices by Proportion of U.S. Corn/Sorghum Acres**

| % of U.S. Corn/Sorghum Acres | Mitigation Points Achieved |
|---|---|
| Points for Mitigation Relief | |
| 7 | 1 |
| 27.3 | 3 |
| 1.4 | 4 |
| 25.2 | 5 |
| 9.1 | ≥6 |
| 30 | exempt |
| Points for Not Irrigating | |
| 85 | 3 |
| Points for No-Till/Mulch Till | |
| 36 | 3 |
| 40 | 2 |
| Points for Reducing Application Rate | |
| 11 | 1 |
| 34 | 2 |
| 36 | 3 |

This analysis can be visualized in Figure 2. To begin, we assume that 100% of growers will adopt the mitigation tracking option to receive 1 point given that it is available to all growers and extremely easy to implement without any time or monetary investment. Next, we assume that 93% of corn and sorghum acres get ≥3 points for mitigation relief (or are exempt) and the remaining 7% will maintain 1 point for mitigation tracking (Panel A in Figure 2). Of the remaining 7% of acres that have 1 point, 85% will receive 3 points for not irrigating their crop (totaling 4 points) (Panel B in Figure 2). Of the remaining 1.1% of acres that only have 1 point, 76% will receive 2-3 points for no-till/conservation tillage (totaling 3-4 points) (Panel C in Figure 2). Of the remaining 0.3% of acres that only have 1 point, 70% will qualify for 2-3 points for application rate reduction (totaling 3-4 points) (Panel D in Figure 2). The remaining 0.08% of acres may be subject to additional mitigation under the mitigation menu.

**Figure 2: Proportion of Corn and Sorghum Acres in Bin 1 Watersheds Receiving Mitigation Points Based on Current Practices**



Therefore, we conclude that ≥99.92% of corn and sorghum acres in Bin 1 watersheds will achieve ≥3 runoff mitigation points without having to change growing practices or atrazine use. We note that our analysis accounted only for 7 out of 27 different practices allowed in EPA's mitigation menu and that additional acreage will likely be eligible for points based on other currently adopted practices, such as soil incorporation, mulching, grassed waterways and cover cropping. Therefore, this estimate likely significantly underestimates the total points that will be achieved using current practices.

In its support document for the runoff mitigation menu, EPA identifies the percent reduction in pesticide runoff it believes will occur following certain mitigations or field characteristics and assigns a point value.[42] In assigning point values, EPA assumes a mitigation with a low, medium, or high efficacy achieves an average of 10-30%, 30-60%, and ≥60% runoff reduction,

---

[42] EPA. Ecological Mitigation Support Document to Support Endangered Species Strategies. Version 1.0. July 2024. Available here: https://www.regulations.gov/document/EPA-HQ-OPP-2023-0365-1133. (Hereafter "Ecological Mitigation Support Document").

respectively.[43] Low, medium, and high efficiency translates to 1, 2, and 3 points, respectively.[44] Therefore, according to EPA, 1,2 and 3 runoff mitigation points equals a 10-30%, 30-60%, and ≥60% runoff reduction, respectively.

Given that 0.08% of corn/sorghum acreage in Bin 1 watersheds may be required to achieve 2 additional runoff mitigation points, we sought to quantify how much runoff reduction would be achieved by atrazine users on corn and sorghum implementing these further mitigations. We assumed this 0.08% of acreage would need to implement at least 2 points to come into compliance with EPA's proposed Bin 1 mitigations (in addition to the 1 point for mitigation tracking). Therefore, we assumed that these 0.08% of corn/sorghum acres in Bin 1 watersheds would reduce atrazine runoff by 60%. Since 2 mitigation points would lead to anywhere from 30-60% runoff reduction by EPA's calculations, we chose the high end of 60% to maintain a conservative estimate. This amounts to a total of 0.048% reduction in atrazine runoff in each watershed.[45]

This analysis is presented in Supplemental File B, Sheet 18. This presents data on the 7,070 HUC12 watersheds in the corn/sorghum use data layer that are Bin 1 watersheds (contain 60-day average atrazine concentrations between 9.7-45.4 ppb) and sorts by the newly predicted 60-day atrazine concentration based on EPA's proposed Bin 1 runoff mitigations. Based on these data, 1 out of 7,070 watersheds (about 0.01%) are estimated to no longer exceed the CE-LOC due to this specific runoff mitigation requirement. The waterbodies in 7,069 watersheds (about 99.99%) are predicted to remain harmful to aquatic plant communities and the wildlife that depend on them.

b. Sugarcane

EPA is proposing to require 3 points of runoff mitigation for users who want to use atrazine in HUC12 watersheds with predicted 60-day average atrazine concentrations between 9.7-45.4 ppb (Hereafter referred to as "Bin 1 watersheds"). 73 of the 134 HUC12 watersheds primarily impacted by atrazine use in sugarcane are Bin 1 watersheds (Supplemental File B, Sheet 19).

Runoff mitigation points are calculated from EPA's recently updated Runoff Mitigation Menu.[46] This menu contains a mix of mitigation "relief points" – which are points given to users who do not implement any mitigation but apply pesticides in areas or in a manner where EPA believes runoff will be reduced – and mitigation points. Importantly, for this analysis, we are not interested in how many atrazine users implement "mitigations," but how many users will be required to implement further mitigations above and beyond their current growing practices. Since EPA has found concerning atrazine levels in the water throughout the country at present day, any mitigation in atrazine harm will necessarily need to come from measures taken above and beyond what is currently in place.

---

[43] Ecological Mitigation Support Document at 47.
[44] Compare Table 5-1 in EPA's Ecological Mitigation Support Document with Mitigation Menu points available here: https://www.epa.gov/pesticides/mitigation-menu.
[45] Assuming 0.08% of corn/sorghum acres in each watershed achieve a 60% reduction in atrazine runoff = 0.0008 * 0.6 = 0.00048 (total 0.048% reduction atrazine runoff in each HUC12 watershed)
[46] https://www.epa.gov/pesticides/mitigation-menu

i.  *Mitigation Relief Points*

To calculate how many atrazine users in sugarcane will qualify for mitigation "relief points," we utilized multiple sources. The three mitigation relief options we assess in this analysis are 1) runoff vulnerability, 2) field slope parameter, and 3) mitigation tracking.[47] To assess the runoff vulnerability relief option, we utilized an EPA-curated county list that assigns points to pesticide users who apply a pesticide in specific counties with medium, low or very low runoff vulnerability scores.[48] From this county list, we assigned scores to each of the 134 HUC12 watersheds in the sugarcane use data layer based on the county/counties they are present in. If a HUC12 watershed was present in multiple counties, the lowest point value was used to maintain conservatism in our analysis. This analysis is presented in Supplemental File B, Sheet 20. For all but 4 out of the 134 watersheds, all FL counties received 3 points, all LA counties received 0 points, and all TX counties received 2 points for the runoff vulnerability relief option. To facilitate our analysis, we applied the above values for all sugarcane watersheds in each state (Table 6).

For the field slope parameter, we assumed that at least 80% of sugarcane fields in FL, TX and LA would meet EPA's definition of a low slope (≤3% grade). This is based on information provided by USDA to EPA indicating that about 80% of sugarcane fields in LA are precision graded (1-2% slopes) as well as images from Florida showing a "typical" flat sugarcane field.[49] Support for most sugarcane fields being grown on flat land is further provided by the BASF ACS presentation discussed in Section 3.a.i, which shows the vast majority of land in southern LA, central FL and the southern tip of TX being low slope.[50] We believe that 80% of sugarcane fields in FL, TX and LA being ≤3% grade is an underestimate, but one that allows us to conservatively estimate runoff reduction in EPA's proposal. Therefore, in our analysis we assume that 80% of acreage in HUC12 watersheds in the sugarcane use data layer will be awarded 2 points for being low slope (Table 6).

In addition to the runoff vulnerability and field slope relief options, EPA also has an additional mitigation relief option worth 1 point, which is the Mitigation Tracking option.[51] This gives the user 1 point for documenting their mitigations in paper or electronic format. Due to the relative ease of this mitigation relief option, our analysis assumes that 100% of atrazine users will choose to implement this option and receive 1 point.

The points achieved in sugarcane acreage for runoff mitigation relief points are presented in Table 6 below.

---

[47] https://www.epa.gov/pesticides/mitigation-menu
[48] EPA. Pesticide Runoff Vulnerability Mitigation Relief Points. Available here: https://www.epa.gov/system/files/documents/2024-10/county-mitigation-relief-points-runoff-vulnerability.pdf
[49] Data Inquiry pages 7, 8 and 14.
[50] BASF ACS presentation Page 14.
[51] https://www.epa.gov/pesticides/mitigation-menu The 4th option down in Table 1.

**Table 6: Mitigation Relief Points that Will Be Achieved by Proportion of U.S. Sugarcane Acres**

| % of U.S. Sugarcane Acres | Mitigation Points Achieved |
|---|---|
| Points for Runoff Vulnerability Relief | |
| Louisiana | |
| 100 | 0 |
| Florida | |
| 100 | 3 |
| Texas | |
| 100 | 2 |
| Points for Low Field Slope | |
| 80 | 2 |
| Points for Mitigation Tracking | |
| 100 | 1 |

### ii. Points for Irrigation Practices

EPA's mitigation menu contains an in-field mitigation option of "irrigation management." Under this option, atrazine users will achieve 3 points for not irrigating their crop or utilizing subsurface irrigation.

The USDA has indicated to EPA that since it rains so much in the LA sugarcane-growing region, most LA sugarcane is not irrigated and the few acres that are irrigated use subsurface irrigation.[52] Furthermore, the Census of Agriculture indicates that only about 1% of LA sugarcane is irrigated.[53] Since only about 1% of LA sugarcane is irrigated and the few acres that are irrigated utilize subsurface irrigation, we have concluded that 100% of LA sugarcane growers would likely receive 3 runoff mitigation points for either not irrigating or using subsurface irrigation.

In Florida, the Census of Agriculture indicates that 99% of sugarcane acreage is irrigated.[54] However, subsurface or seepage irrigation is almost exclusively used in FL and overhead irrigation is "very limited," according to USDA.[55] The USDA did not provide EPA with irrigation practices for sugarcane in south Texas, so for this analysis we assumed that TX sugarcane irrigation practices are similar to that of central Florida. Given that irrigation is common and most irrigation is subsurface or seepage irrigation, we assumed that 90% of FL and TX sugarcane acres would receive 3 runoff mitigation points for using subsurface irrigation. We believe this is a conservative estimate to account for the few acres that use above-ground irrigation. Table 7 below shows the assumptions we make regarding irrigation practices.

---

[52] Data Inquiry page 13.
[53] Benefits Assessment page 30.
[54] Benefits Assessment page 30.
[55] Data Inquiry page 13.

**Table 7: Points Achieved for Irrigation Practices by Proportion of U.S. Sugarcane Acres**

| % of U.S. Sugarcane Acres | Mitigation Points Achieved |
|---|---|
| Louisiana | |
| 100 | 3 |
| Florida and Texas | |
| 90 | 3 |

### iii. Points for Tillage Practices

EPA's mitigation menu contains an in-field mitigation option of "conservation tillage." Under this option, atrazine users will achieve 3 points for using the no-till practice, which includes perennial cropping.[56]

USDA has indicated to EPA that sugarcane is a perennial crop, which generally grows for 3-5 years, followed by one year of tillage and rotation with beans or other crops.[57] Therefore, the typical growing method for sugarcane is four years on, one year off. This means that out of every 10 years, eight will be spent growing sugarcane without tillage and two will be spent tilling and planting a rotational partner. With this typical growing schedule implemented by all sugarcane acreage in a given watershed, this means that 20% of growers will be tilling in any given year and 80% will be growing a perennial crop without tillage and able to receive 3 mitigation points.

Therefore, our analysis assumes that 80% of sugarcane acres would achieve 3 points for not tilling in any given year and 20% would receive no points due to tilling. This is outlined in Table 8 below.

**Table 8: Points Achieved for No-Till/Perennial**

| % of U.S. Sugarcane Acres | Mitigation Points Achieved |
|---|---|
| 80 | 3 |

### iv. Points for Application Rate Reduction

EPA's mitigation menu contains an application parameter mitigation option of an "annual application rate reduction." Under this option, atrazine users will achieve 1 point for applying 10% to <30% less than the maximum labeled annual application rate; 2 points for applying 30% to <60% less than the maximum labeled annual application rate, and; 3 points for applying ≥60% less than the maximum labeled annual application rate.[58]

To assign a point value to the sugarcane acreage that currently applies less than maximal annual rates of atrazine, we estimated the proportion of sugarcane acreage that would qualify for 1, 2, or

---

[56] https://www.epa.gov/pesticides/mitigation-menu
[57] Data Inquiry page 13.
[58] https://www.epa.gov/pesticides/mitigation-menu

3 points based on current atrazine application practices identified by EPA. EPA's mitigation points awarded by % reduction are as follows: 10% to <30% reduction = 1 point, 30% to <60% reduction = 2 points, ≥60% reduction = 3 points.

Since EPA has proposed to reduce the maximum annual application rate for sugarcane to 8 lbs a.i./A/year in Florida and to 4 lbs a.i./A/year in Louisiana and Texas, that is the ceiling we have used to determine percent reduction.

The data on application rate in sugarcane is not as detailed as it is in corn. Therefore, all we have available to analyze is the average annual atrazine application rate in FL and LA and TX. EPA has cited multiple sources that identify an average annual application rate of 4.5 and 6-8 lbs a.i./A/year in Florida and 2.2 and 2-3 lbs a.i./A/year in Louisiana and Texas.[59] Given the wide range in these values, we chose a representative average value of 6 lbs a.i./A/year in Florida and 2.5 lbs a.i./A/year in Louisiana and Texas as the average annual atrazine application rate in those areas. Given these are averages, roughly 50% of atrazine-sprayed acreage would be expected to apply atrazine below those rates.

Our analysis assumes that 50% of atrazine-sprayed acres would be expected to use less than 6 lbs a.i./A/year in Florida. Since this represents a ≥25% decrease in atrazine compared to the maximum annual rate of 8 lbs a.i./A/year, we assume that 50% of Florida sugarcane acres will receive at least 1 point for using less than maximal rates (10% to <30% reduction = 1 point). We note that this is a highly conservative estimate, as most of these 50% of growers would receive more than 1 point for application rate reduction (given that all of them would have at least a 25% decrease).

Our analysis also assumes that 50% of atrazine-sprayed acres would be expected to use less than 2.5 lbs a.i./A/year in Texas and Louisiana. Since this represents a ≥37.5% decrease in atrazine compared to the maximum annual rate of 4 lbs a.i./A/year, we assume that 50% of TX and LA sugarcane acres will receive at least 2 points for using less than maximal rates (30% to <60% reduction = 2 points).

Using the above assumptions, Table 9 identifies the point values we use in our analysis to account for points achieved through application rate reductions.

---

[59] Benefits Assessment page 24.

**Table 9: Points Achieved Through Application Rate Reduction by Proportion of U.S. Sugarcane Acres**

| % of U.S. Sugarcane Acres | Mitigation Points Achieved |
|---|---|
| Florida | |
| 50 | 1 |
| Louisiana and Texas | |
| 50 | 2 |

> *v.* *Percent of Sugarcane Acres that Can Achieve 3 Mitigation Points Based on Current Practices*

To determine how many sugarcane acres in Bin 1 watersheds would be eligible for 3 atrazine runoff mitigation points based on current practices and field characteristics, we used the proportionality approach outlined in Figure 1.

For this analysis, we used the information on mitigation adoption outlined in Tables 6-9. This accounts for sugarcane acres that can achieve points for: mitigation relief, irrigation practices, tillage, and application rate reduction. Table 10 below combines the point totals from Tables 6-9.

**Table 10: Points Achieved Through Mitigation Menu Practices by Proportion of U.S. Sugarcane Acres**

| % of U.S. Sugarcane Acres | Mitigation Points Achieved |
|---|---|
| Points for Runoff Vulnerability Relief | |
| Louisiana | |
| 100 | 0 |
| Florida | |
| 100 | 3 |
| Texas | |
| 100 | 2 |
| Points for Low Field Slope | |
| 80 | 2 |
| Points for Mitigation Tracking | |
| 100 | 1 |
| Points for Irrigation Practices | |
| Louisiana | |
| 100 | 3 |
| Florida and Texas | |
| 90 | 3 |
| Points for No-Till/Perennial | |
| 80 | 3 |
| Points for Reducing Application Rate | |
| Florida | |
| 50 | 1 |
| Louisiana and Texas | |
| 50 | 2 |

For the HUC12 Bin 1 watersheds primarily impacted by atrazine use in sugarcane, we conclude that none will be required to implement any further mitigation. This is because 100% of the Florida acreage that grows sugarcane will attain 3 mitigation points for residing in a "low runoff vulnerability" county (Table 6). And 100% of the Louisiana acreage that grows sugarcane will attain 3 mitigation points for either not irrigating or utilizing subsurface irrigation (Table 7). And 100% of the Texas acreage that grows sugarcane will attain 3 mitigation points for utilizing the mitigation tracking option (1 point) and residing in a "medium runoff vulnerability" county (2 points)(Table 6).

Therefore, we conclude that 100% of sugarcane acres in Bin 1 watersheds will achieve ≥3 runoff mitigation points without having to change growing practices or atrazine use. We note that our analysis accounted only for 6 out of 27 different practices allowed in EPA's mitigation menu and that additional acreage will likely be eligible for points based on other currently adopted practices, such as soil incorporation, mulching, grassed waterways and cover cropping.

Therefore, this estimate likely significantly underestimates the total points that will be achieved using current practices.

Therefore, no further mitigations are expected to be implemented in Bin 1 watersheds that are primarily impacted by atrazine use in sugarcane and no reduction in atrazine concentration in these watersheds is expected (Supplemental File B, Sheet 19).

4) **How EPA's Requirements for Bin 2 Mitigations (6 points) are Likely to Impact Current Growing Practices and Atrazine Use in Watersheds with Predicted 60-day Average Atrazine Concentrations > 45.4 ppb**

a. <u>Corn and Sorghum</u>

Predicting what proportion of corn and sorghum acreage will achieve 6 mitigation points is a bit more complex than predicting how many will achieve 3 points. This is because implementing one practice is often enough to obtain 3 points, but to get 6 points it takes a combination of at least two menu options in EPA's mitigation menu. This requires making certain assumptions about who will be combining multiple mitigation options to achieve the required number of points. For this analysis, we took the same proportionality approach outlined in Section 3.a and Figure 1.

EPA is proposing to require 6 points of runoff mitigation for users who want to use atrazine in HUC12 watersheds with predicted 60-day average atrazine concentrations > 45.4 ppb (Hereafter referred to as "Bin 2 watersheds"). 4,045 of the 11,115 HUC12 watersheds primarily impacted by atrazine use in corn/sorghum are Bin 2 watersheds (Supplemental File B, Sheet 21).

As outlined in Section 3.a, runoff mitigation points are calculated from EPA's recently updated Runoff Mitigation Menu.[60] This menu contains a mix of mitigation "relief points" – which are points given to users who do not implement any mitigation but apply pesticides in areas or in a manner where EPA believes runoff will be reduced – and mitigation points. Importantly, for this analysis, we are not interested in how many atrazine users implement "mitigations," but how many users will be required to implement further mitigations above and beyond their current growing practices. Since EPA has predicted concerning atrazine levels in the water throughout the country at present day, any mitigation in atrazine harm will necessarily need to come from measures taken above and beyond what is currently in place.

We used the information calculated in Section 3.a and summarized in Table 5 for this analysis. Table 5 is reproduced below for ease of referencing:

---

[60] https://www.epa.gov/pesticides/mitigation-menu

**Table 5: Points Achieved Through Mitigation Menu Practices by Proportion of U.S. Corn/Sorghum Acres**

| % of U.S. Corn/Sorghum Acres | Mitigation Points Achieved |
|---|---|
| Points for Mitigation Relief | |
| 7 | 1 |
| 27.3 | 3 |
| 1.4 | 4 |
| 25.2 | 5 |
| 9.1 | ≥6 |
| 30 | exempt |
| Points for Not Irrigating | |
| 85 | 3 |
| Points for No-Till/Mulch Till | |
| 36 | 3 |
| 40 | 2 |
| Points for Reducing Application Rate | |
| 11 | 1 |
| 34 | 2 |
| 36 | 3 |

In Figure 3 below, we use the proportionality approach we used in Section 3.a to determine the number of growers who would be eligible for 6 runoff points based on current practices and field characteristics.

**Figure 3: Proportion of Corn and Sorghum Acres in Bin 2 Watersheds Receiving Mitigation Points Based on Current Practices.** Yellow squares represent the proportion of corn/sorghum acreage that will receive at least 6 runoff mitigation points based on current practices. Green squares represent acreage percentage that is too small to be further divided up.



In Figure 3, each Step is a different mitigation option in EPA's mitigation menu. Step 1 corresponds to the "Percent of Corn Acres" and "mitigation points" for the "Points for Mitigation Relief" group in Tables 1 and 5. These are the points that will be achieved by proportion of acreage for the following mitigation relief options: "reduced runoff potential," "low slope," "mitigation tracking" and "sandy soils." 30% of corn/sorghum growers would be exempt from having to achieve any points.

Step 2 adds the additional mitigation option of using no irrigation (taken from Tables 2 and 5). This practice is currently implemented on 85% of corn acreage in the U.S. and achieves 3 additional mitigation points. So, for each of the 4 categories in Step 1 that have not achieved 6 points, 85% of the acreage in each category will also add an additional 3 points while 15% will not receive any additional points.

Step 3 adds the additional mitigation option of implementing no-till (taken from Tables 3 and 5). This practice is currently implemented on 36% of corn acreage in the U.S. and achieves 3 additional mitigation points. For each of the 5 categories in Step 2 that have not achieved 6 points, 36% will also add an additional 3 points while 64% will not receive any additional points.

Step 4 adds the additional mitigation option of implementing mulch-till (taken from Tables 3 and 5). This practice is currently implemented on 40% of corn acreage in the U.S. and achieves 2 additional mitigation points. For each of the 5 categories in Step 3 that have not achieved 6 points, 40% will also add an additional 2 points while 60% will not receive any additional points.

Step 5 adds the additional mitigation option of reducing application rate by 60-99% (taken from Tables 4 and 5). This practice is currently implemented on 36% of corn acreage in the U.S. and achieves 3 additional mitigation points. For each of the 7 categories in Step 4 that have not achieved 6 points, 36% will also add an additional 3 points while 64% will not receive any additional points.

Step 6 adds the additional mitigation option of reducing application rate by 30-60% (taken from Tables 4 and 5). This practice is currently implemented on 34% of corn acreage in the U.S. and achieves 2 additional mitigation points. For each of the 5 categories in Step 5 that have not achieved 6 points, 34% will also add an additional 2 points while 66% will not receive any additional points.

Adding up the percentage of corn/sorghum acreage in the yellow squares equals 96.3% of corn/sorghum acreage in Bin 2 watersheds that is estimated to achieve at least 6 runoff mitigation points based on current practices. We note that our analysis accounted only for 7 out of 27 different practices allowed in EPA's mitigation menu and that additional acreage will likely be eligible for points based on other currently adopted practices, such as soil incorporation, mulching, grassed waterways and cover cropping. Therefore, this estimate likely significantly underestimates the total points that will be achieved using current practices.

The remaining 3.7% of corn/sorghum acreage in Bin 2 watersheds (represented by all the green squares and the remaining white squares in Step 6) may be required to implement additional mitigations based on EPA's current proposal. 3.5% of the 3.7% of acreage that has not received 6 mitigation points have already achieved ≥3 mitigation points (Figure 3, Step 6), therefore the majority of remaining acreage will only need an additional 1-3 points to achieve the required 6 points for runoff mitigation. As discussed in Section 3.a, EPA estimates that 1-3 mitigation points will reduce runoff anywhere from 10% to >60%. We chose the high-end value of 60% atrazine runoff reduction as an estimate for atrazine reduction in the remaining 3.7% of acreage to maintain a conservative estimate of runoff reduction.

Therefore, we assumed that 3.7% of corn/sorghum acreage in Bin 2 watersheds would need to reduce atrazine runoff concentrations by 60% to come into compliance with EPA's proposed Bin 2 mitigations. This amounts to a total of 2.22% reduction in atrazine runoff in each watershed.[61]

This analysis is presented in Supplemental File B, Sheet 21. This presents data on all of the 4,045 HUC12 watersheds in the corn/sorghum use data layer that are Bin 2 watersheds (contain 60-day average atrazine concentrations >45.4 ppb) and sorts by the newly predicted 60-day atrazine concentration based on EPA's proposed Bin 2 runoff mitigations. Based on these data, 127 out of 4,045 watersheds (about 3%) are estimated to no longer exceed the 95th percentile of the CE-LOC due to this specific runoff mitigation requirement. However, 100% of the waterbodies in these watersheds are still predicted to contain atrazine at levels at least 4.5x higher than the CE-LOC. While atrazine levels in these watersheds may be minimally reduced, they still present a clear and present danger to aquatic plant communities and the wildlife that depend on them.

   b. Sugarcane

Predicting what proportion of sugarcane acreage will achieve 6 mitigation points is a bit more complex than predicting how many will achieve 3 points. This is because implementing one practice is often enough to obtain 3 points, but to get 6 points it takes a combination of at least two menu options in EPA's mitigation menu. This requires making certain assumptions about who will be combining multiple mitigation options to achieve the required number of points. For this analysis, we took the same proportionality approach outlined in Section 3.a and Figure 1.

EPA is proposing to require 6 points of runoff mitigation for users who want to use atrazine in HUC12 watersheds with predicted 60-day average atrazine concentrations > 45.4 ppb (Hereafter referred to as "Bin 2 watersheds"). 61 of the 134 HUC12 watersheds primarily impacted by atrazine use in sugarcane are Bin 2 watersheds (Supplemental File B, Sheet 22).

As in Section 3, runoff mitigation points are calculated from EPA's recently updated Runoff Mitigation Menu.[62] This menu contains a mix of mitigation "relief points" – which are points given to users who do not implement any mitigation but apply pesticides in areas or in a manner where EPA believes runoff will be reduced – and mitigation points. Importantly, for this analysis, we are not interested in how many atrazine users implement "mitigations," but how many users will be required to implement further mitigations above and beyond their current growing practices. Since EPA has found concerning atrazine levels in the water throughout the country at present day, any mitigation in atrazine harm will necessarily need to come from measures taken above and beyond what is currently in place.

We used the information calculated in Section 3.b and summarized in Table 10 for this analysis. Table 10 is reproduced below for ease of referencing:

---

[61] Assuming 3.7% of corn/sorghum acres in each watershed achieve a 60% reduction in atrazine runoff = 0.037 * 0.6 = 0.0222 (total 2.22% reduction atrazine runoff in each HUC12 watershed)
[62] https://www.epa.gov/pesticides/mitigation-menu

**Table 10: Points Achieved Through Mitigation Menu Practices by Proportion of U.S. Sugarcane Acres**

| % of U.S. Sugarcane Acres | Mitigation Points Achieved |
|---|---|
| Points for Runoff Vulnerability Relief | |
| Louisiana | |
| 100 | 0 |
| Florida | |
| 100 | 3 |
| Texas | |
| 100 | 2 |
| Points for Low Field Slope | |
| 80 | 2 |
| Points for Mitigation Tracking | |
| 100 | 1 |
| Points for Irrigation Practices | |
| Louisiana | |
| 100 | 3 |
| Florida and Texas | |
| 90 | 3 |
| Points for No-Till/Perennial | |
| 80 | 3 |
| Points for Reducing Application Rate | |
| Florida | |
| 50 | 1 |
| Louisiana and Texas | |
| 50 | 2 |

In Figures 4-6 below, we use the proportionality approach we used in Section 3 to determine the number of Florida, Texas and Louisiana sugarcane growers who would be eligible for 6 runoff points based on current practices and field characteristics.

**Figure 4: Proportion of Florida Sugarcane Acres in Bin 2 Watersheds Receiving Mitigation Points Based on Current Practices**



Figure 4 shows the percentage of sugarcane acres in Bin 2 watersheds in Florida estimated to receive at least 6 mitigation points based on current practices. To begin, we assume that 100% of FL sugarcane growers will adopt the mitigation tracking option to receive 1 point and will also receive 3 points for growing in a "low runoff vulnerability" county (4 points total) (Panel A in Figure 4). Next, we assume that 80% of FL sugarcane acres get an additional 2 points for growing on a low slope field (6 points total)(Panel B in Figure 4). Of the remaining 20% of acres that have 4 points, 90% will receive 3 additional points for not irrigating their crop or using subsurface irrigation (totaling 7 points) (Panel C in Figure 4). Of the remaining 2% of acres that only have 4 points, 80% will receive 3 points for not tilling (totaling 7 points) (Panel D in Figure 4). The remaining 0.4% of FL sugarcane acres in Bin 2 watersheds may be subject to additional mitigation under the EPA's runoff mitigation proposal.

**Figure 5: Proportion of Texas Sugarcane Acres in Bin 2 Watersheds Receiving Mitigation Points Based on Current Practices**



Figure 5 shows the percentage of sugarcane acres in Bin 2 watersheds in Texas estimated to receive at least 6 mitigation points based on current practices. To begin, we assume that 100% of TX sugarcane growers will adopt the mitigation tracking option to receive 1 point and will also receive 2 points for growing in a "low runoff vulnerability" county (3 points total) (Panel A in Figure 5). Next, we assume that 90% of TX sugarcane acres get an additional 3 points for not irrigating their crop or using subsurface irrigation (6 points total)(Panel B in Figure 5). Of the remaining 10% of acres that only have 3 points, 80% will receive 3 points for not tilling (totaling 6 points) (Panel C in Figure 5). Of the remaining 2% of acres that only have 3 points, 80% will receive 2 points for growing on a low slope field (5 points total)(Panel D in Figure 5). Of the remaining 1.6% of acres that have 5 points, 50% will receive 2 points for having a reduced application rate (7 points total)(Panel E in Figure 5). The remaining 1.2% of TX sugarcane acres in Bin 2 watersheds may be subject to additional mitigation under the EPA's runoff mitigation proposal.

**Figure 6: Proportion of Louisiana Sugarcane Acres in Bin 2 Watersheds Receiving Mitigation Points Based on Current Practices**



Figure 6 shows the percentage of sugarcane acres in Bin 2 watersheds in Louisiana estimated to receive at least 6 mitigation points based on current practices. To begin, we assume that 100% of LA sugarcane growers will adopt the mitigation tracking option to receive 1 point and will also receive 3 points for irrigation practices (4 points total) (Panel A in Figure 6). Next, we assume that 80% of LA sugarcane acres get an additional 2 points for growing on a low slope field (6 points total)(Panel B in Figure 6). Of the remaining 20% of acres that have 4 points, 80% will receive 3 additional points for not tilling (totaling 7 points) (Panel C in Figure 6). Of the remaining 4% of acres that only have 4 points, 50% will receive 2 additional points for applying atrazine at a reduced rate (totaling 6 points) (Panel D in Figure 6). The remaining 2% of LA sugarcane acres in Bin 2 watersheds may be subject to additional mitigation under the EPA's runoff mitigation proposal.

Therefore, 0.4% of FL sugarcane acres, 1.2% of TX sugarcane acres, and 2% of LA sugarcane acres in Bin 2 watersheds may be required to implement additional mitigations based on EPA's current proposal. We note that our analysis accounted only for 6 out of 27 different practices allowed in EPA's mitigation menu and that additional acreage will likely be eligible for points based on other currently adopted practices, such as soil incorporation, mulching, grassed

waterways and cover cropping. Therefore, this estimate likely significantly underestimates the total points that will be achieved using current practices.

All of the remaining acreage that has not received 6 mitigation points has already achieved ≥3 mitigation points (Figures 4-6), therefore the remaining acreage will only need an additional 2-3 points to achieve the required 6 points for runoff mitigation. As discussed in Section 3.a, EPA estimates that 1-3 mitigation points will reduce runoff anywhere from 30% to >60%. We chose the high-end value of 60% atrazine runoff reduction as an estimate for atrazine reduction in the remaining acreage to maintain a conservative estimate of runoff reduction.

Therefore, we assumed that 0.4% of FL sugarcane acreage, 1.2% of TX sugarcane acreage and 2% of LA sugarcane acreage in Bin 2 watersheds would need to reduce atrazine runoff concentrations by 60% to come into compliance with EPA's proposed Bin 2 mitigations. This amounts to a total of 0.24% reduction in atrazine runoff in FL Bin 2 watersheds, 0.72% reduction in atrazine runoff in TX Bin 2 watersheds, and a 1.2% reduction in atrazine runoff in each LA Bin 2 watershed.[63]

This analysis is presented in Supplemental File B, Sheet 22. This presents data on all of the 61 HUC12 watersheds in the sugarcane use data layer that are Bin 2 watersheds (contain 60-day average atrazine concentrations >45.4 ppb) and sorts by the newly predicted 60-day atrazine concentration based on EPA's proposed Bin 2 runoff mitigations. Based on these data, 1 out of 61 watersheds (about 1.5%) are estimated to no longer exceed the 95th percentile of the CE-LOC due to this specific runoff mitigation requirement. However, 100% of the waterbodies in these watersheds are still predicted to contain atrazine at levels at least 4.5x higher than the CE-LOC. While atrazine levels in these watersheds may be minimally reduced, they still present a clear and present danger to aquatic plant communities and the wildlife that depend on them.

### 5) How the combination of EPA's proposed runoff mitigations is likely to impact atrazine levels in watersheds containing ≥ 9.7 ppb

Based on our analyses in Section 2, we found that EPA's proposed maximum annual application rate reductions would result in 120 out of 11,249 CE-LOC-exceeded watersheds (about 1%) to no longer exceed the CE-LOC (119 in corn/sorghum growing regions and 1 in sugarcane growing regions). The waterbodies in 11,129 watersheds (about 99%) in all growing regions are predicted to remain harmful to aquatic plant communities and the wildlife that depend on them.

Based on our analyses in Section 3, we found that EPA's proposed Bin 1 mitigations would result in 1 out of 7,143 CE-LOC-exceeded Bin 1 watersheds (about 0.01%) to no longer exceed the CE-LOC (1 in corn/sorghum growing regions and 0 in sugarcane growing regions). The

---

[63] Assuming 0.4% of sugarcane acres in each FL watershed achieves a 60% reduction in atrazine runoff = 0.004 * 0.6 = 0.0024 (total 0.24% reduction atrazine runoff in each FL HUC12 watershed). Assuming 1.2% of sugarcane acres in each TX watershed achieves a 60% reduction in atrazine runoff = 0.012 * 0.6 = 0.0072 (total 0.72% reduction atrazine runoff in each TX HUC12 watershed). Assuming 2% of sugarcane acres in each LA watershed achieve a 60% reduction in atrazine runoff = 0.02 * 0.6 = 0.012 (total 1.2% reduction atrazine runoff in each LA HUC12 watershed).

waterbodies in 7,142 watersheds (about 99.99%) in all growing regions are predicted to remain harmful to aquatic plant communities and the wildlife that depend on them.

Based on our analyses in Section 4, we found that EPA's proposed Bin 2 mitigations would result in 0 out of 4,106 CE-LOC-exceeded Bin 2 watersheds (0%) to no longer exceed the CE-LOC. The waterbodies in all 4,106 watersheds (100%) in all growing regions are predicted to remain harmful to aquatic plant communities and the wildlife that depend on them.

It's important to assess how the combination of proposed mitigations would impact atrazine levels in these impaired waters. To do this, we combined the percent reductions estimated for rate reductions and for Bin 1/Bin 2 mitigations for all 11,249 HUC12 waterbodies that are impaired for atrazine.

This analysis is outlined in Supplemental File B, Sheet 23 and Sheet 24 for the 7,070 Bin 1 watersheds and 4,045 Bin 2 watersheds in corn/sorghum growing regions, respectively. This analysis is outlined in Supplemental File B, Sheet 25 and Sheet 26 for the 73 Bin 1 watersheds and 61 Bin 2 watersheds in sugarcane growing regions, respectively.

Supplemental File B, Sheet 27 combines Sheets 23-26 to compile the estimated atrazine reduction in all 11,249 impaired HUC 12 watersheds. Importantly, this includes the predicted impact of all of EPA's proposed runoff mitigations combined.

This analysis shows that EPA's proposed runoff mitigation plan will only result in 123 out of 11,249 HUC 12 watersheds (1%) to drop below the CE-LOC. 246 watersheds out of 4106 (6%) would drop below the 95th percentile of the CE-LOC, but all of those would still remain well above the CE-LOC. All Bin 2 watersheds would remain more than 4x higher than the current CE-LOC. Each atrazine-impaired HUC 12 watershed would only see predicted atrazine concentrations reduced by roughly 2-6% (Supplemental File B, Sheet 27 ).

We conclude that EPA's proposed runoff mitigation plan will be highly ineffective at protecting wildlife and will have very little impact on atrazine water levels throughout the country.

### 6) Limitations, Assumptions and Uncertainties in This Analysis

   a. Watershed Impacts by Use

In Section 2.a, we divide up atrazine-impacted HUC12 watersheds based on whether they are primarily impacted by atrazine use in sugarcane or corn and sorghum. There are likely some watersheds that are impacted by both. For instance, the southern tip counties of Texas grow both sorghum and sugarcane, which both likely lead to atrazine contamination in nearby watersheds. Furthermore, atrazine use in upstream watersheds on corn or sorghum could also result in downstream contamination of a watershed where sugarcane is primarily grown. Therefore, some watersheds will likely have atrazine coming from multiple sources and our analysis did not parse that out.

However, we don't believe this will significantly impact our analysis. This is mainly due to the similarities of estimated atrazine reductions between the use data layers. For instance, both the

corn/sorghum and sugarcane use data layer assumes similar amounts of atrazine reduction in watersheds due to EPA's proposed application rate reduction (2% in sugarcane vs 1.8-4% in corn/sorghum – Section 2). And we also find that most atrazine users will be exempt from having to implement mitigations from EPA's mitigation menu (100% of sugarcane growers in Bin 1 watersheds compared to 99.92% of corn/sorghum growers in Bin 1 watersheds, and 98%-99.6% for sugarcane growers in Bin 2 watersheds compared to 96.3% of corn/sorghum growers in Bin 2 watersheds – Sections 3-4).

Therefore, we conclude that there is very little difference in estimated atrazine reduction between sugarcane-growing watersheds and corn/sorghum-growing watersheds. We conclude that any misclassifications in atrazine-contributing uses in any given watershed will not significantly affect our analysis or conclusions.

b. <u>Corn, Sorghum and Sugarcane Growers Vs. Atrazine Users</u>

In Sections 3-4 our analysis assumes that the proportion of corn, sorghum and sugarcane growers that implement a certain practice from the mitigation menu will be divided up evenly between all growers in that watershed. However, not all corn, sorghum and sugarcane growers use atrazine. It is possible that a particular mitigation adoption could be predominantly adopted by atrazine-users or non-users. For instance, if 60% of corn growers implement a certain mitigation practice but most of those that implement that practice do not use atrazine, then our analysis would not be correct and we would overestimate the adoption of mitigation amongst atrazine users. Vis versa, the opposite could also be true and we would underestimate adoption of mitigation amongst atrazine users.

For our analysis of mitigation adoption from EPA's mitigation menu, we analyze 1) mitigation relief, 2) irrigation practices, 3) application rate reductions, and 4) tilling practices. In terms of mitigation relief (field slope, runoff vulnerability zones, soil type and mitigation tracking), we know of no resource indicating that atrazine use in corn, sorghum or sugarcane is more or less likely to occur in fields of a certain slope, runoff vulnerability county or soil type. Similarly, mitigation tracking and irrigation practices would also not be expected to be more or less likely to track with atrazine use than any other variable of crop production. Application rate reductions are only relevant to atrazine users, and therefore, not of concern. Furthermore, growers who are exempt from having to implement Bin 1 and Bin 2 mitigation only have in common that they are >1,000 ft from non-managed areas or water – also not expected to track significantly with atrazine use.

However, it is possible that tilling practices may bias with atrazine use. This is because tilling is sometimes used in lieu of herbicide application, and not tilling tends to promote herbicide use to kill weeds. Therefore, the adoption of no-till would be more likely to bias towards herbicide users than non-users because herbicides are an alternative weed control practice. Since our analysis (and EPA's mitigation menu) gives points to growers for not tilling or growing a perennial crop, we assume that our analysis would tend to bias towards *underestimating* mitigation adoption amongst atrazine users because atrazine users would conceptually be more likely to not till than corn-growers in general. Therefore, we would expect our assumption that

36% of corn growers practice no-till to actually be higher amongst corn growers who use atrazine. This biases towards conservatism in our assessment.

### c.   Uncertainties in Mitigation Relief Options for Corn

While we were able to roughly calculate how many mitigation relief points would be achieved for sugarcane acreage in Section 3.b using our own analysis, mitigation relief for corn acreage in Section 3.a was estimated using an analysis conducted by a pesticide registrant and a consulting company.[64] This analysis has not been published and was presented at the American Chemical Society's 2024 Fall Meeting. We cannot independently verify the results in this presentation, and they have not been peer-reviewed or published, which we recognize as a deficiency in our analysis.

However, conceptually, the results appear to highly align with how EPA has been presenting the potential impact (or lack thereof) of mitigation relief points. EPA has stated in agency documents that at least 80% of all cultivated land in the U.S. would achieve points for just the "runoff vulnerability" relief option alone,[65] which is one of five possible relief options.[66] EPA has also produced "scenarios" on how the agency believes mitigation point requirements would impact growers with certain field specifications. Of the three scenarios that concerned corn and sorghum (non-irrigated corn on flat land in IN, non-irrigated corn on sloped land in IA, and non-irrigated low-rainfall sorghum in the Western US), EPA concluded that all of those acres would achieve anywhere from 2-5 mitigation relief points automatically and would ultimately achieve 9-10 mitigation points total with current practices.[67]

So, while we can't independently confirm the accuracy of the BASF study, the results are aligned with how EPA has been communicating the lack of industry impact from the agency's mitigation menu. Therefore, we have used this study as the best scientific data available because the results are highly consistent with how the agency has been communicating about the mitigation menu to stakeholders. If the EPA is skeptical of the results from this study, we encourage the agency to do an independent analysis itself.

### d.   Impacts of Regional Differences in Irrigation

In Section 3.a, we assume that 85% of growers in each corn/sorghum watershed will achieve 3 mitigation points for not irrigating their crop (Table 2). This assumption is based on the national

---

[64] 64 Campana, D and Hassinger, C. Quantifying field characteristic exemptions and runoff mitigation points from EPA's ESA Strategy Documents. Presentation at the American Chemical Society 2024 Fall Meeting. August 18, 2024. Available here: https://complianceservices.com/wp-content/uploads/Quantifying-the-Potential-Agricultural-Area-Affected-by-EPAs-Draft-Herbicide-Strategy_18Aug24.pdf. Document also submitted to the docket. (Hereafter "BASF ACS presentation").

[65] EPA. Herbicide Strategy to Reduce Exposure of Federally Listed Endangered and Threatened Species and Designated Critical Habitats from the Use of Conventional Agricultural Herbicides. August 2024. Page 51. Available here: https://www.regulations.gov/document/EPA-HQ-OPP-2023-0365-1137. And Farrugia, F. EPA'S ECOLOGICAL MITIGATION MEASURES. MAY 09, 2024. Presentation to Stakeholders. Page 5. Available here: https://www.epa.gov/system/files/documents/2024-08/mitigation-workshop-meeting_05092024.pdf.

[66] https://www.epa.gov/pesticides/mitigation-menu. First 5 options in mitigation menu.

[67] EPA. Application of EPA's Runoff and Erosion and Spray Drift Mitigations Through Scenarios that Represent Crop Production Systems in Support of Endangered Species Strategies. August 2024. Pages 14-16. Available here: https://www.regulations.gov/document/EPA-HQ-OPP-2023-0365-1139.

average of 85% of corn growers (and a similar number of sorghum growers) that do not irrigate. In reality, there are some regional differences in corn irrigation that are not accounted for in our analysis.[68] For instance, the 85% national statistic will likely overestimate points given for states like NE and CO (which have over 50% of fields irrigated) and underestimate points given for states like IN, MN, IL, IA, OH (where less than 10% of fields are irrigated). We note that NE is the only state EPA identifies as having a significantly higher irrigation rate that also contains a significant number of watersheds with CE-LOC exceedances.

Irrigation in Nebraska is regional, with the Eastern part of the state receiving much more rain that the Central and Western parts of the state, resulting in Eastern NE having lower irrigation rates than the rest of the state.[69] Eastern NE is also the part of the state where most of the CE-LOC exceedances are.[70] This makes sense, as the more rainfall in a region, the more likely there is to be runoff and resulting water contamination. Therefore, the Eastern part of the state relevant to our analysis is less likely to be irrigated than Nebraska as a whole. So, our lack of a regional analysis for states like Nebraska is less impactful than state-specific data would indicate.

Even assuming that all NE watersheds had a 50% irrigation rate, it would still not impact our analysis significantly. Subbing in a value of 50% for the analysis in Figure 2 (panel B), would lead to an overall percentage of acres that need more mitigation of 99.75% compared to the 99.92% percent we originally found. Assuming a 60% decrease in atrazine levels from acres needing further mitigation, that would translate to a 0.15% decrease in atrazine levels in NE Bin 1 watersheds compared to a 0.048% decrease nationally. The difference is so miniscule as to have little impact on our analysis.

Therefore, we conclude that not accounting for regional differences in irrigation will not significantly affect our findings.

### e. Impacts of Regional Differences in Tilling

In Section 3.a, we assume that 76% of growers in each corn/sorghum watershed will achieve 3 mitigation points for not tilling or 2 points for mulch tilling (Table 3). This assumption is based on the national average of 76% of corn growers (and a similar number of sorghum growers) that practice one of those two tilling techniques. In reality, there are some regional differences in corn tillage that are not accounted for in our analysis. For instance, the Northern Crescent and Northern Great Plains are known to have lower adoptions of no-till and mulch-till than the rest of the country. [71] However, since those regions of the country have far fewer watersheds with CE-LOC exceedances than the rest of the Midwest and South, any overestimating of tillage adoption would be reduced considerably.

---

[68] Benefits Assessment Page 30.

[69] Nebraska Corn Board. What's the Difference Between Dry Land Corn and Irrigated Corn? Available here: https://nebraskacorn.gov/cornstalk/whats-the-difference-between-dry-land-corn-and-irrigated-corn/.

[70] EPA. Updated High Resolution Map (Without Roads) of HUC 12 Watersheds that Exceed the Updated CE-LOC for Atrazine. Available here: https://www.regulations.gov/document/EPA-HQ-OPP-2013-0266-2137.

[71] USDA. Economic Research Service. Tillage Intensity and Conservation Cropping in the United States. September 2018. Page 13. Available here: https://ers.usda.gov/sites/default/files/_laserfiche/publications/90201/EIB-197.pdf?v=77252.

But even if we assumed that only 45% of growers practice no-till or mulch-till (which is the lowest regional adoption rate in the U.S.[72]) instead of the 76% we assume in our analysis, it would still not impact our results significantly. Subbing in a value of 45% for the analysis in Figure 2 (panel C), would lead to an overall percentage of acres that need more mitigation of 99.83% compared to the 99.92% percent we originally found. Assuming a 60% decrease in atrazine levels from acres needing further mitigation, that would translate to a 0.1% decrease in atrazine levels in Bin 1 watersheds in areas with lower no-till adoption compared to a 0.048% decrease nationally. The difference is so miniscule as to have little impact on our analysis.

Therefore, we conclude that not accounting for regional differences in no-till or mulch-till will not significantly affect our findings.

### f.   Impacts of Regional Differences in Application Rate

In Section 3.a, we assume that a certain percentage of growers in each corn/sorghum watershed will achieve 0-3 mitigation points for using a reduced application rate (Table 4). This assumption is based on EPA-compiled data on the proportion of corn growers that currently use atrazine at specific rates.[73] In Section 2.b, we were able to incorporate regional differences in atrazine use rates into our analysis of how maximal rate reductions would impact atrazine levels in HUC 12 watersheds. However, for our analyses in Sections 3 and 4, it was too complex to incorporate regional data. Therefore, there are some regional differences in atrazine application rates that are not accounted for in our Bin 1 and Bin 2 analyses. For instance, EPA found that 45% of atrazine users in the Plains states applied greater than 1 lbs a.i./A/year atrazine on corn, while 80% of corn growers in the Southern Seaboard applied above that rate.[74]

But even if we assumed that 0% of growers would achieve 2-3 points for rate reduction (which is way overly-conservative) instead of the 70% we assume in our analysis, it still would not impact our results significantly. Subbing in a value of 0% for the analysis in Figure 2 (panel D), would lead to an overall percentage of acres that need more mitigation of 99.75% compared to the 99.92% percent we originally found. Assuming a 60% decrease in atrazine levels from acres needing further mitigation, that would translate to a 0.15% decrease in atrazine levels in Bin 1 watersheds compared to the original 0.048% decrease nationally. The difference is so miniscule as to have little impact on our analysis.

Therefore, we conclude that not accounting for regional differences in no-till or mulch-till will not significantly affect our findings.

### g.   Impacts of Potential Combinational Bias in Mitigation Adoption Estimation

In Section 6d, e and f, we show that regional differences in point accumulation from certain mitigations would not have a significant impact on our findings when analyzed individually, but it's possible that the *combination* of regional differences from multiple mitigation options could

---

[72] USDA. Economic Research Service. Tillage Intensity and Conservation Cropping in the United States. September 2018. Page 13. Available here: https://ers.usda.gov/sites/default/files/_laserfiche/publications/90201/EIB-197.pdf?v=77252.

[73] Benefits Assessment Page 24; Table 6.

[74] Benefits Assessment Page 24; Table 6.

"synergize" together if they tend to overestimate mitigation adoption in a certain region. For instance, if one state generally has higher application rates, higher irrigation rate, lower tillage rate and does not qualify for relief points, then our analysis could significantly overestimate corn or sugarcane acres in that state that currently qualify for mitigation points.

To test for this, we determined which regions of the U.S. our assumptions may have overestimated mitigation adoptions (and, therefore, points achieved) for Bin1 and Bin 2 watersheds, in order to identify whether there were any regions that could be over-represented.

For this analysis, we divided the U.S. into different regions used by the USDA.[75] The chart in this resource is reproduced below.



Source: USDA, Economic Research Service.

In analyzing where relief points could potentially be overestimated, we used the BASF ACS presentation analysis.[76] Potential overestimation in regional relief point accumulation could

[75] USDA. Researchers looked at soybean production changes across farm resource regions designated by USDA, Economic Research Service. July 26, 2023. Available here: https://www.ers.usda.gov/data-products/chart-gallery/gallery/chart-detail?chartId=106936.

[76] 76 Campana, D and Hassinger, C. Quantifying field characteristic exemptions and runoff mitigation points from EPA's ESA Strategy Documents. Presentation at the American Chemical Society 2024 Fall Meeting. August 18, 2024. Available here: https://complianceservices.com/wp-content/uploads/Quantifying-the-Potential-Agricultural-

occur in "high runoff vulnerability" areas, which are located mainly in the Heartland and Mississippi Portal regions.[77] Potential overestimation in regional relief point accumulation could also occur in areas with high slopes, which are located mainly in the Eastern Uplands.[78] Potential overestimation in regional relief point accumulation could also occur in areas with low sand-content soils, which are located mainly in the Heartland, Eastern Uplands, Prairie Gateway.[79]

In analyzing where other mitigation points could potentially be regionally overestimated, we used EPA's benefits assessments. EPA notes that corn irrigation is highest in NE, GA and CO,[80] which could lead to potential overestimation in regional mitigation point accumulation in the Northern Great Plains, Heartland, Prairie Gateway and Southern Seaboard. Adoption of no-till and mulch-till is known to be lowest in the Northern Crescent and Northern Great Plains regions, which could lead to potential overestimation in regional mitigation point accumulation in those regions. The highest atrazine application rates, and potential for regional overestimation in mitigation point accumulation, occur in the Southern Seaboard region.[81]

There does not appear to be any region in the U.S. that is overrepresented among parameters that could lead to an overestimation of point adoption. Therefore, we conclude that the totality of potential regional biases in mitigation point adoption will not significantly impact the conclusions of our analysis.

### 7) Supplemental Files

[Supplemental File A](#)

[Supplemental File B](#)

Respectfully submitted,

Nathan Donley, Ph.D.
Environmental Health Science Director
Environmental Health Program
Center for Biological Diversity

---

[Area-Affected-by-EPAs-Draft-Herbicide-Strategy_18Aug24.pdf](#). Document also submitted to the docket. (Hereafter "BASF ACS presentation").
[77] BASF ACS presentation Page 4.
[78] BASF ACS presentation Page 14.
[79] BASF ACS presentation Page 15.
[80] Benefits Assessment page 30.
[81] Benefits Assessment Page 24; Table 6.